**CINSA, S.A. DE C.V., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**and**

**General Housewares Corp., Defendant–Intervenor.**

**Slip Op. 97–41.**
**Court No. 93–09–00538.**

United States Court of International Trade.

April 4, 1997.

---

Manatt, Phelps & Phillips (Irwin P. Altschuler, David R. Amerine and Ronald M. Wisla), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta Melnbrencis), Washington, DC, for defendant.

King & Spalding (Joseph W. Dorn and Gregory C. Dorris), Washington, DC, for defendant–intervenor.

## OPINION

MUSGRAVE, District Judge.

Plaintiff Cinsa, S.A. de C.V. ("Cinsa") brings this action to contest the final results of the fourth administrative review of the antidumping duty order *Porcelain–on–Steel Cooking Ware from Mexico; Final Results of Antidumping Duty Administrative Review,* 58 Fed.Reg. 43,327 (1993). In the final results, the U.S. Department of Commerce ("Commerce") determined that Cinsa would be assessed a 8.18% dumping margin. Pursuant to 19 U.S.C. § 1516a(a)(2)(A)(ii) (1994), Cinsa appealed the final results and requested that this Court reverse the final results and remand the action with respect to: (1) calculation of the cost of production ("COP") and constructed value ("CV") using historical rather than revalued depreciation; (2) calculation of COP and CV excluding employee profit sharing expense; (3) calculation of CV using Cinsa's arm's length purchase prices to value enamel frit raw material costs; and (4) calculation of COP and CV using all verified interest income. The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(A) (1994) and remands Commerce's finding of calculation of CV to determine whether the transfer price of enamel frit constituted an arm's length transaction as prescribed by the statute and previous practice. The Court affirms the final results with respect to the calculation of COP and CV using revalued rather than historical depreciation, calculation of COP and CV including employee profit sharing expense and calculation of COP and CV using all verified interest income.

## Background

On December 2, 1986, Commerce issued an antidumping duty order on *Porcelain–on–Steel Cooking Ware from Mexico*, 51 Fed. Reg. 43,415 (1986). On January 30, 1991, Commerce initiated its fourth administrative review of the order as to Cinsa and another Mexican manufacturer covering the period from December 1, 1989 to November 30, 1990. *Porcelain–on–Steel Cooking Ware from Mexico; Notice of Initiation*, 56 Fed. Reg. 3,445 (1991). On February 13, 1991 Commerce issued an antidumping questionnaire to Cinsa and Cinsa filed a timely response on April 26, 1991. Commerce issued a supplemental questionnaire to Cinsa on June 5, 1991 and Cinsa made timely supplemental response on June 21, 1991. Commerce conducted an on-site verification of Cinsa's questionnaire responses between July 8 and July 12, 1991. Separate sales and cost verification reports were issued on December 17, 1991.

On December 27, 1991, Commerce issued its preliminary determination establishing a 6.27% dumping margin for Cinsa. *Porcelain–on–Steel Cooking Ware from Mexico; Preliminary Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 67,062 (1991). For the preliminary determination Commerce revised Cinsa's reported COP and/or CV calculations to: (1) increase COP and CV to take into account revalued depreciation; (2) increase COP and CV to take into account employee profit sharing expenses; (3) use best information available ("BIA") to increase the reported raw material costs for enamel frit; and (4) increase COP and CV by offsetting total interest expense with short-term interest expense to zero. Cinsa and defendant-intervenor General Housewares Corp. ("GHC") submitted their comments on January 27, 1992. On February 3, 1992, Cinsa and GHC filed comments in rebuttal. On August 16, 1993, Commerce published the final results of the antidumping administrative review establishing an 8.18% antidumping duty assessment rate and future duty deposit rate for Cinsa. *Porcelain–on–Steel Cooking Ware from Mexico; Final Results of Antidumping Duty Administrative Review*, 58 Fed.Reg. 43,327 (1993) ("final results").

On August 24, 1993, Cinsa timely filed comments alleging ministerial and clerical errors in Commerce's final results. On September 1, 1993, GHC filed a response to Cinsa's claims of clerical errors. Cinsa timely filed this action to contest the alleged errors on September 15, 1993. On December 23, 1993, Commerce determined that certain errors were, indeed, made in the final results and revised Cinsa's antidumping duty assessment rate and future duty deposit rate to 6.71%. On March 31, 1994, this Court granted leave for Commerce to publish the corrected final results of its fourth administrative review, which was published on May 6, 1994. *Porcelain–on–Steel Cooking Ware from Mexico; Amendment to Final Results of Antidumping Duty Administrative Review*, 59 Fed.Reg. 23,694 (1994). Cinsa nevertheless appeals the findings made in the amended final results with respect to Commerce's: (1) calculation of COP and CV using revalued rather than historical depreciation; (2) calculation of COP and CV including employee profit sharing expense; (3) calculation of CV using Cinsa's arm's length purchase prices to value enamel frit raw material costs; and (4) calculation of COP and CV using all verified interest income.

## Standard of Review

The Court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law, ..." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citation omitted). "[Substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted). "As long as

the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence·in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–5, 636 F.Supp. 961, 966 (1986), *aff'd* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

## Discussion

### I. Revalued Depreciation Costs vs. Historical Depreciation Costs

In a preliminary matter, Commerce asserts that Cinsa is barred from bringing the issue of distortion of depreciation cost methods because Cinsa failed to raise the issue during the administrative proceeding. The Court finds that Cinsa's well ᐧdocumented disagreement with the use of revalued depreciation costs in determining COP/CV in the administrative record necessarily involves the issue of distortion. As Commerce states, "[t]his Court has accepted Commerce's practice of using a 'firm's expenses as recorded in its financial statements as long as those statements are prepared in accordance with the home country's GAAP and do not significantly *distort* the firm's financial position or actual costs.'" Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 11. (emphasis added) (citations omitted). Commerce cannot utilize the language of the Court in one instance and disregard that same language in another. The Court finds that distortion of costs is a necessary component in the review of depreciation cost methodology as the quote above clearly points out.

Cinsa submitted depreciation costs based on the historical method in its questionnaire response but submitted financial statements that utilized revalued depreciation costs. Cinsa argues that historical depreciation values best reflects the actual costs during the period of review ("POR"). Commerce relied on depreciation costs based on the revalued

method that Cinsa had used to calculate its own financial records. The issue turns on where the burden of persuasion lies: is Commerce required to make a finding that the home market GAAP does not distort COP or is the burden on Cinsa to make a showing that the home market GAAP distorts COP? It is the view of Commerce that the revalued numbers reflect the method accepted by Mexican GAAP, ending their inquiry. Cinsa argued that revalued figures distort the actual costs of the merchandise and should not be used in calculating COP.

Pursuant to an affirmative finding of sales at less than fair value ("LTFV"), Commerce is directed to impose an antidumping duty "in an amount equal to the amount by which the foreign market value exceeds the United States Price for the merchandise." 19 U.S.C. § 1673(2)(B) (1994). When Commerce makes a determination that foreign market value ("FMV") cannot be based on home market pricing due to inadequate sales at prices not below the COP in that home market, as is the case here, Commerce may use constructed value ("CV") as a basis for FMV. 19 U.S.C. § 1677b(a)(4) (1994). CV is determined by calculating the sum of the cost of materials and the "fabrication or processing of any kind employed in producing such or similar merchandise ... which would ordinarily permit the production of that particular merchandise in the ordinary course of business." 19 U.S.C. § 1677b(e) (1994).

In determining CV under these circumstances, Commerce has utilized the cost values from Cinsa's questionnaire responses and from Cinsa's submitted financial statements. Both revalued and historical cost methods are recognized under Mexican generally accepted accounting principles ("GAAP"). Commerce has employed both historical and revalued depreciation methods in determining CV in previous cases.[1] The relevant legislative history provides that Commerce "will employ accounting principles generally accepted in the home market of the country of exportation if [Commerce] is satisfied that

---

1. See *Circular Welded Non–Alloy Steel Pipe From the Republic of Korea,* 57 Fed.Reg. 42,942 (1992) where Commerce used revalued depreciation costs, contrasted with *Stainless Steel Hollow* *Products from Sweden,* 58 Fed.Reg. 69,332 (1993) where Commerce used historical depreciation costs.

such principles reasonably reflect the variable and fixed costs of production the merchandise." H.R.Rep. No. 93–571, at 71 (1973).

■ In determining the proper methodology in determining CV, the Court has previously found that

> this Court has consistently upheld Commerce's reliance on a firm's expenses as recorded in the firm's financial statements, as long as those statements were prepared in accordance with the home country's GAAP and does not significantly distort the firm's actual costs.

*FAG U.K. Ltd. v. United States*, 20 CIT ——, ——, 945 F.Supp. 260, 271 (1996) (citations omitted). The same situation exists in the instant case. Cinsa submitted its financial statements that reflected revalued depreciation costs which were consistent with Mexican GAAP. The Court finds that the burden rests on Cinsa to prove that the use of revalued depreciation in calculating CV and COP distorted costs.

> The court finds that respondents have failed to demonstrate that the ITA's decision to use Hyundai's revalued depreciation expenses is distortive. The verified revalued depreciation expenses were consistent with Korean GAAP and were based on information obtained directly from Hyundai's financial statements.

*Laclede Steel Co. v. United States*, 18 CIT 965, 975, (1994). Commerce is directed to make a finding that cost values reflect the home country GAAP and were based on that firm's financial statements, which is what occurred in the instant case.[2]

■ Cinsa failed to satisfy the burden in proving that the use of revalued depreciation costs distorted the actual cost of the subject merchandise. Cinsa argued that use of revalued depreciation costs distorted actual costs of production. Cinsa stated that

> in calculating COP/CV for a specific period of time, the revaluation of assets has a

distortive effect on depreciation expenses. Due to constant revaluation, over time the restatement of depreciation of assets results in charges that *can* be greater than the acquisition cost of the asset, and *can* continue past the end of the asset's useful life. Thus, while the restatement of depreciation *may* be appropriate for financial statement purposes, the restatement of depreciation expenses is not appropriate for all purposes.

Pl.'s Mem Supp Summ. J. at 14 (emphasis added). Although Cinsa's argument is objectively correct in that any accounting method *can* or *may* be distortive, Cinsa fails to demonstrate that the revalued method is distortive in the instant case. Cinsa makes no showing that during the POR use of revalued depreciation distorted costs. For example, Cinsa never posits, much less proves, that using the revalued cost method actually resulted in charges that are greater than the acquisition costs of its assets in this case. Cinsa, therefore, has failed to satisfy its burden and the Court holds that Commerce's use of revalued depreciation costs in determining COP/CV is supported by substantial evidence on the record and otherwise in accordance with law.

## II. Inclusion of Profit Sharing Expense in COP Calculation

Cinsa is required to share earned profits with its employees pursuant to Mexican law. Cinsa shares earned profit only if the company actually earns a profit on its operations. Cinsa did not include profit sharing expense paid during the POR in its calculation of COP/CV claiming that profit sharing is contingent on profitability and is not attributable to the cost of production of the subject merchandise and therefore is properly treated as an income tax, which is not included in COP/CV calculations. Commerce, however, included Cinsa's profit sharing expense in its calculation of COP/CV arguing that profit

---

2. The final results state:

> The Department followed Mexican GAAP and adjusted CINSA's COP data to reflect the revalued depreciation. This approach coincided with CINSA's financial statements, which actually showed historical depreciation adjust-

ments for inflation, and which were prepared in accordance with Mexican GAAP. We did, however, recalculate the amount of the adjustment to the COP to correct a clerical error in the calculation. 58 Fed.Reg. 43,327 at 43,331 (1993).

sharing expenses are a part of the production process and therefore a component of labor wages. Relying on its own administrative precedent, Commerce characterized profit sharing expenses as mandatory payments representing "compensations to the employees involved in the production of the merchandise and administration of the company." *Porcelain–on–Steel Cooking Ware from Mexico; Final Results of Antidumping Duty Administrative Review,* 58 Fed.Reg. 43,327 at 43,332 (1993). Commerce has found that all "costs related to labor, bonuses and fringe benefits are considered to be part of the labor expense and, thus, a cost of production." *Porcelain–on–Steel–Cooking Ware From Taiwan,* 51 Fed.Reg. 36,425 at 36,428 (1986).

■ Including profit sharing expense in the calculation of the COP is an issue of first impression for the Court. Constructed value is ascertained by calculating the sum of

> the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of business; ...

19 U.S.C. § 1677b(e)(1) (1994). Whether employee profit sharing expenses should be included in CV and COP calculations turns on how profit sharing expenses are classified. If profit sharing expenses are classified as a necessary component of production, as Commerce argues, they are properly includable in COP/CV calculations. If profit sharing expenses are classified as a type of income tax, profit sharing expenses would not be includable in the cost of production. Mexican law requires firms to pay employees a certain percentage of the profits earned, therefore, profit sharing is properly characterized as a cost of doing business in Mexico and the expense is properly classified as a cost of production as required by the statute. The Court finds that Commerce's inclusion of

profit sharing expenses in calculation COP/CP is not inconsistent with 19 U.S.C. § 1677b(e)(1), is supported by substantial evidence and is otherwise in accordance with law.

## III. Related Party Pricing

Pursuant to the antidumping statute, Commerce may utilize best information available ("BIA") if pricing between related parties does not "fairly reflect the amount usually reflected in sales in the market under consideration."[3] Commerce determined that Cinsa purchased enamel frit, an ingredient used in production of the subject merchandise, from a related supplier at prices that were not at arm's length and consequently used BIA to calculate the price in determining the CV of the subject merchandise. In the first three administrative reviews, Commerce accepted the pricing from the related supplier in its calculation of constructed value of the subject merchandise. In the fourth administrative review now before the Court, Commerce departed from this methodology and used BIA in its CV calculation. Cinsa objects to this departure from Commerce's methodology used in the three previous reviews.

In its questionnaire response, Cinsa stated that it obtained enamel frit from a related supplier at a cost substantially lower than sales to unrelated parties. Cinsa explained that this discount was due to factors not associated with the relationship with the supplier. Specifically, Cinsa described in its questionnaire response that the discount was due to the savings of transportation costs and volume discounts. Cinsa argues its questionnaire response provided Commerce with adequate information substantiating its claim that the prices of enamel frit were above the cost of production. Cinsa claims that proof of prices above the cost of production is all that Commerce required Cinsa in certifying that the transfer prices were at arm's length.[4] Further, Cinsa also asserts that the

---

**3.** 19 U.S.C. § 1677b(f)(2) (1994):

> "a transaction directly or indirectly between [related parties] may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually

> reflected in sales of merchandise under consideration in the market under consideration."

**4.** Commerce requested the following information from Cinsa in the questionnaire:

> For Constructed Value, the transfer price for transactions between the related companies may

information that it had provided in its questionnaire response was exactly the same for the previous three administrative reviews where Commerce posed the identical question yet reached a different conclusion.

■ Commerce defended its use of BIA by stating that the burden of proof to demonstrate arm's length transactions, the test for related parties, rests squarely on the respondent of the questionnaire. Commerce concluded that Cinsa did not meet this burden in the fourth review because Cinsa failed to provide pricing information on sales of enamel frit to unrelated third parties. In the final results, Commerce found that

> CINSA's submission indicated that the transfer prices from its related supplier were less than the prices paid by an unrelated purchaser of the same material, we determined that the transfer prices were not made at arm's length. Therefore, in accordance with 773(e)(2) of the Act [19 U.S.C. § 1677b(f)(2)], we used BIA for constructed value to calculate the cost of the enamel frit used by CINSA.

58 Fed.Reg. 43,327 at 43,332 (1993). Commerce may disregard transactions between related parties if one of the elements of value does not reflect the amount usually reflected in sales in the market for the subject merchandise. 19 U.S.C. § 1677b(f)(2) (1994). The Court agrees with Commerce that the burden is on the respondent to "establish that the transfer price for the purchase of raw material from the related party reflects an arms-length price." Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 26 citing *NEC Home Electronics, Ltd. v. United States*, 18 CIT 336, 1994 WL 176914 (1994). However, the Court finds that Cinsa has fulfilled its burden by supplying Commerce with an explanation

of how Cinsa determined that the transfer price was representative of a fair market price and an explanation of how Cinsa determined that transfer prices were above the cost of production.[5] Cinsa provided the information that Commerce directly requested in the questionnaire. The Court agrees with Cinsa that Commerce cannot disregard the transfer prices based on the fact that Cinsa did not furnish third party sales information. Providing Commerce with third party sales information is not the only means by which to prove arm's length transfer prices.

■ Cinsa effectively shifted the burden to Commerce by providing a host of information explaining the reasons for the discount in transfer price. The Court finds that Commerce did not subsequently meet its burden in determining that the transfer price was not negotiated at arm's length. Commerce's determination in the final results is merely a conclusory statement that affords the Court no basis for ascertaining whether Commerce took into consideration Cinsa's information that provided reasons for the discount in transfer prices between the related parties.

In the three previous administrative reviews, Commerce accepted Cinsa's submitted transfer prices of enamel frit based on the acceptance that the transfer price was at arm's length. In the fourth administrative review, Commerce rejected Cinsa's submitted transfer prices determining that the transfer prices were not made at arm's length. Cinsa claims that Commerce was obligated to follow the methodology it had adopted in each previous review and Cinsa claims that it provided Commerce with the same information in each of the reviews. Commerce argues that it is not bound by

---

be used to value materials inputs if the transfer prices are above the cost of production. However, the transfer price must "fairly reflect the amount usually reflected in sales in the market under consideration." For example, if a market exists for the identical or similar input obtained from your related supplier, the price could be compared to purchases from unrelated suppliers. Please explain how you determined that the transfer price was representative of a fair market price. Include an explanation as to how you determined that transfer prices were above the cost of production.

**5.** In its questionnaire response, Cinsa stated

> The discount from the list price is based upon the fact that Cinsa purchases almost [ ] times as much enamel as [the related supplier] sells to all unrelated purchasers combined .... there is little or no transportation or packaging expense incurred in the sale of the enamel products to Cinsa.... The data contained in Exhibit 30 confirms that the transfer prices paid by Cinsa exceed [the related supplier's] cost of production.
> Pl.'s Questionnaire Resp. at 60.

previous determinations and that each "administrative review is a separate administrative procedure, with a separate administrative record, and a separate administrative determination which is reviewable separately by suit in this Court." Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 31. Ironically, Commerce quickly makes the comparison that in the first administrative review Commerce "verified that the frit seller charged an arm's length price." *Id.* citing *Porcelain–on–Steel Cooking Ware from Mexico,* 55 Fed.Reg. 21, 061 at 21,064 (1990). It is clear that Commerce did not verify or attempt to verify the information provided by Cinsa in the fourth administrative review as Commerce had done in the first administrative review. The Court is satisfied that Cinsa provided Commerce with the same information on related party transfer prices and Commerce failed to employ the same methodology in the fourth administrative review.

■ The Court agrees with Commerce that each administrative review is a separate exercise of administrative procedure opening the possibility of different conclusions based on different facts accumulated. Commerce, however, cannot arbitrarily abandon a relied upon methodology. In other words, Commerce can reach different determinations in separate administrative reviews but it must employ the same methodology or give reasons for changing its practice. It is a well settled rule that an agency cannot arbitrarily change its methodology without explanation. As this Court has found:

> While the Commission is not obligated to follow prior decisions if new arguments or facts are presented that support a different conclusion, ... this does not permit the Commission to act arbitrarily. This is because it is also a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure. This rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of a statute.

*Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988) (citations omitted). It is apparent that Commerce applied a different methodology in the fourth administrative review without providing reasons for its departure. The Court finds that Commerce did not satisfy its burden of verifying that the transfer prices were not at arm's length and that Commerce did not provide adequate reasons for departing from its prior methodology. Therefore the finding is contrary to law and not supported by substantial evidence in the record.

## IV. Calculation of Financial Expense

Commerce included both short and long-term interest expenses in its calculation of COP and used short-term interest income to offset the interest expenses. The threshold question is whether Cinsa properly presented this issue at the administrative level. Both Commerce and GHC assert that Cinsa failed to raise this issue at the administrative review and should be precluded from arguing the issue before the Court. Cinsa states that there is ample evidence on the record to support its claim that this issue was timely raised. In Cinsa's Supplemental Questionnaire Response, Cinsa stated that

> the ITA has requested that Cinsa report financial expenses based on the total financial expenses, including short-term and long-term expenses, whether related to the production of the merchandise under investigation or other corporate activities. *The last sentence of this question requests Cinsa to exclude long-term income, which suggests that the ITA intends to treat interest income different [sic] from interest expense.* Clearly, such different treatment for interest income and expense violates the fundamental precept of antidumping comparisons as announced by the Court of Appeals for the Federal Circuit in *Smith–Corona v. United States,* 713 F.2d 1569 [1568], 1578 (1982) dumping calculations must be based on an "apples to apples" comparison.

Pl.'s Supplemental Questionnaire Resp. at 3 (emphasis added). From this language it appears that Cinsa properly raised the issue at the administrative level. Commerce and GHC further argue that Cinsa only objected to Commerce's inclusion of long and short-term interest expenses and Cinsa did not

raise the issue of offset income accounts. The response underlined above indicates that Cinsa made an issue of the different treatment by Commerce of expenses and incomes on the record and prior to Commerce's final determination. The Court finds that Cinsa properly raised this issue at the administrative level and the issue is properly before the Court.

Commerce included both short and long-term interest expenses in its calculation of COP and used short-term interest income to offset the interest expenses. Cinsa earned substantially more short and long-term interest income than interest expenses it incurred during the POR, therefore, Cinsa desired to have COP calculated with both short and long-term interest income included. Cinsa claims that Commerce erred when it did not include long-term interest income in COP. Cinsa asserts that Commerce should not include either long-term interest expenses or long-term interest income in an effort to make the correct and fair comparison or, in the alternative, if Commerce includes long-term interest expenses, it should also include long-term interest income as an offset, thereby making a fair comparison.

Commerce and GHC contest Cinsa's argument on the basis that exclusion of long-term interest income is a "longstanding methodology" and is a "reasonable exercise of its administrative discretion." Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 38. Further, Commerce and GHC contend that long-term interest income does not directly relate to current production cost, while payments of long and short-term interest expense are current costs that must be included in COP. Cinsa claims that Commerce erred when it allowed offset of interest income only to the extent of interest expense. Cinsa bases this argument on the point that this policy ignores "any financial income that exceeds the amount of the company's financial expenses, although there is no difference in the nature of the income taken into account and that ignored." Pl.'s Reply Br. at 38.

■ Commerce argues that interest income is properly viewed as an offset to interest expense, not to COP, and can only be used to reduce total interest expense to not

less than zero. The Court agrees with Commerce. Under the statute, Commerce is directed to determine COP as "accurately as possible the true cost to the respondent of manufacturing the subject merchandise." *Timken Co. v. United States,* 18 CIT 1, 10, 852 F.Supp. 1040, 1049 (1994). Commerce is further directed to calculate the COP by including all costs of producing the subject merchandise excluding profit under 19 U.S.C. § 1677b and 19 C.F.R. § 353.51(c). The cost of producing the subject merchandise necessarily involves the cost of borrowed capital used in its manufacture in the form of interest expense. Without the borrowed capital, Cinsa would not be able to produce the subject merchandise. Income expense attributable to the production of the subject merchandise is properly identified as an expense and, therefore, includable in calculating COP. Commerce has made it a practice to offset interest expense with interest income that was generated and attributable to the production of the subject merchandise. This is a practice that benefits the respondent by lowering the COP value, which in turn lowers the dumping margin. In the instant case, the offset effectively reduced the interest expense to zero in the calculation of COP. Cinsa claims that Commerce excluded long term interest income offsets that exceeded interest expenses that would have further lowered the COP.

■ The Court finds that expenses by their nature cannot produce a negative effect on the COP. Expenses, as a component of costs, cannot become a profit by the nature of their designation. Cinsa is effectively requesting that Commerce and the Court recognize a negative cost. Based on sound accounting and economic principles, the Court declines to accept a finding of negative costs when calculating COP. Interest expense, as a component of COP, is a discrete expense account and as such, cannot provide an offset to any other expense accounts. Once the interest expense account is reduced to zero through the offset of interest income, interest expense and interest income has no further effect on the calculation of COP. The Court finds that once interest expense is reduced to zero, no further inquiry is neces-

sary as Commerce cannot enter a profit into the calculation of COP. The Court finds that Commerce's calculation of Cinsa's interest expense for COP is supported by substantial evidence and is otherwise in accordance with law.

The Court recognizes the final decision of the binational panel concerning the fifth administrative review of *Porcelain–on–Steel Cooking Ware from Mexico.* The Court by statute is not bound by the final decision and is not required to consider the final decision.[6]

### Conclusion

The Court remands Commerce's finding of calculation of CV to determine whether the transfer price of enamel frit constituted an arm's length transaction as prescribed by the statute and previous practice. The Court affirms all of Commerce's other findings in the amended final results of the fourth administrative review.

### ORDER

Upon reading plaintiff's motion for summary judgment, defendant's and defendant-intervenor's cross-motions for summary judgment, plaintiff's response, and defendant's and defendant-intervenor's replies, and upon consideration of all other papers and proceedings had herein, it is hereby:

**ORDERED** that this case is remanded to the Department of Commerce who shall recalculate the constructed value to determine whether the transfer price of enamel frit constituted an arm's length transaction as prescribed by the statute and previous practice; and it is further

**ORDERED** that Commerce's determination, to the extent challenged herein, is affirmed in all other respects; and it is further

**ORDERED** that the remand results shall be filed with the Court within ninety (90) days of the date this order is entered; and it is further

6. 19 U.S.C. § 1516a(b)(3) (1994) Effect of decisions by NAFTA or United States Canada binational panels:

In making a decision in any action brought under subsection (a) of this section, a court of

**ORDERED** that any party contesting the remand results shall file comments or responses within thirty (30) days after the remand results are due; and it is further

**ORDERED** that Commerce shall have fifteen (15) days after the final date for filing comments or responses.

the United States is not bound by, but may take into consideration, a final decision of a binational panel or extraordinary challenge committee convened pursuant to article 1904 of the NAFTA or of the Agreement.