**Slip. Op. 00-70**

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| AGRO DUTCH FOODS LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Before: WALLACH, Judge |
| v. | : | Court No.: 99-03-00168 |
| | : | |
| | : | |
| UNITED STATES, | : | **PUBLIC VERSION** |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| COALITION FOR FAIR PRESERVED | : | |
| MUSHROOM TRADE, | : | |
| | : | |
| Defendant-Intervenor | : | |
| | : | |
| | : | |

[Final Determination affirmed.]                    Decided: June 19, 2000

Manatt, Phelps & Phillips (Lizbeth R. Levinson, Jeffrey S. Neeley, and Ronald M. Wisla), Washington, DC, for Plaintiff.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; Velta A. Melnbrencis, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Robert J. Heilferty, Of Counsel, Office of the Chief Counsel for Import Administration, for Defendant.

Collier Shannon Scott, PLLC (Michael J. Coursey and Adam H. Gordon), Washington, DC, for Defendant-Intervenor.

# I

## INTRODUCTION

At issue in this case are two aspects of the Department of Commerce, International Trade Administration's ("Commerce") Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms From India, 63 Fed. Reg. 72246 (Dep't Commerce 1998) ("Final Determination"), in which Commerce found that Plaintiff, Agro Dutch Foods Ltd. ("Agro Dutch") was selling its product for less than fair value (i.e. dumping) in the United States. Agro Dutch, through a Motion For Judgment On The Agency Record, pursuant to USCIT Rule 56.2, contends that Commerce erred 1) by denying it a startup cost adjustment for the construction of additional growing rooms at its plant in India, and 2) by not allocating its costs of production more heavily to its smaller mushrooms produced than its larger ones.

For the reasons set forth below, the court finds that both Commerce's denial of the startup cost adjustment and its determination that costs should be allocated evenly on all sizes of mushrooms are supported by substantial record evidence.

# II

## BACKGROUND

Agro Dutch grows and preserves mushrooms in India and exports them to the United States. Mushroom production begins with the preparation of composting materials in a composting yard.

Those materials are gathered, aerated and processed through controlled temperature and airflow, and then plastic bags are filled with compost and mushroom spawn.

The process continues in the rooms of the growing farm. Its rooms are filled with the compost bags, and there, in the dark, under specific controlled atmospheric conditions, the mushrooms grow. The compost materials in each bag are covered with casing soil, which is made up of spent compost and ash, and the mushrooms grow up through the casing soil. When the mushrooms reach the desired size, they are picked. The picked mushrooms are blanched, processed either whole or sliced, and then canned. Response of Agro Dutch Foods Limited to Section A of the Questionnaire ("Section A Response") (March 20, 1998), at A-16 to A-21.

In 1996, Agro Dutch had forty-four growing rooms at its farm. Response of Agro Dutch Foods Limited to Sections B, C & D of the Questionnaire ("Section B, C and D Responses") (April 21, 1998), at p. 64. It began construction of an additional twenty-two rooms in 1996. Id. It began to use some of the rooms in February 1997, and was utilizing all twenty-two by April 1997. Id. Commerce denied Agro Dutch a startup cost adjustment for the addition of the new growing rooms.[1]

---

[1] A startup cost adjustment is an adjustment to the cost of production of goods which is granted to a party to account for the abnormally high costs associated with the initial phase of commercial production in a new facility. 19 U.S.C. § 1677b(f)(1)(C)(ii) (1994).

No distinction as to the size of the mushrooms was made in the scope of the investigation. Final Determination at 72246. In the arguments, the mushrooms were categorized generally as simply large and small ("button") mushrooms. The previously described growing process applies to all sizes of mushrooms, and the various sizes grow side by side in the growing rooms. Id. at 72254. The only difference in the growing process is that the larger mushrooms grow for a slightly longer time than the smaller ones. Id.; Memorandum in Support of Motion for Judgment Upon the Agency Record of Agro Dutch Food, Ltd. ("Plaintiff's Memorandum") at 8. The different sizes grow in the same bags. Final Determination at 72254. Agro Dutch Foods Limited Response to Supplemental Questionnaire -- Section D ("Supplemental Section D Response") (June 10, 1998) at 8. Although the mushrooms grow out of the same materials, harvesting of the smaller mushrooms is a more labor-intensive task. Final Determination at 72254.

Some of the small mushrooms are perfectly shaped, and they are picked separately and sold as a premium product, at a higher price than the other mushrooms produced. Supplemental Section D Response at 7-8. The size of the remaining mushrooms picked depends on customer orders. Section A Response at A-20.

Agro Dutch argued that more of its growing costs should have been allocated to the allegedly premium smaller mushrooms. Plaintiff's Memorandum at 17. Commerce found instead that all growing costs were identical for all mushrooms when measured by weight, and therefore allocated growing costs per kilogram, regardless of the size of the individual mushrooms. Final Determination at 72254.

4

III

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c) (1994). The court will uphold Commerce's determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion. Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

IV

ANALYSIS

A

**Commerce's Denial of The Startup Cost Adjustment
Is Supported by Substantial Evidence in The Record
And Otherwise in Accordance With Law**

Any startup cost adjustment is governed by the two prongs of 19 U.S.C. § 1677b(f)(1)(C)(ii) (1994), which provides:

ii)     Adjustments shall be made for startup operations only where –
    I)     A producer is using new production facilities or producing a new product that requires substantial additional investment, and
    II)     production levels are limited by technical factors associated with the initial phase of commercial production.

The mechanics of the startup cost adjustment are detailed in 19 U.S.C. § 1677b(f)(1)(C)(iii) (1994).[2]

Commerce found that Agro Dutch did not fulfill either requirement. Specifically, it found that the new growing rooms did not rise to the standard of a "new production facility," and that Agro Dutch had not shown its production levels were limited by technical factors. Final Determination at 72253. Because both conditions must be met in order for a startup cost adjustment to be granted, Agro Dutch must show Commerce erred on both in order to have the determination set aside. See 19 U.S.C. § 1677b(f)(1)(C)(ii) (1994); Pohang Iron and Steel Co., Ltd. v. United States, 1999 WL 970743, at *5, fn 10 (CIT Oct. 20, 1999).

In this instance, Commerce's analysis of the first prong is weak. However, Commerce also found that Agro Dutch failed to meet the second prong, and its conclusion on that issue is supported by

---

[2]     That section states:

> The adjustment for startup operations shall be made by substituting the unit production costs incurred with respect to the merchandise at the end of the startup period for the unit production costs incurred during the startup period. If the startup period extends beyond the period of the investigation or review under this subtitle, the administering authority shall use the most recent cost of production data that it reasonably can obtain, analyze, and verify without delaying the timely completion of the investigation or review. For purposes of this subparagraph, the startup period ends at the point at which the level of commercial production that is characteristic of the merchandise, producer, or industry concerned is achieved.

19 U.S.C. § 1677b(f)(1)(C)(iii) (1994).

6

substantial evidence.  Therefore, Agro Dutch's Motion for Judgment on the Agency Record is denied as to the startup cost adjustment.

The court addresses the second prong, the "production levels are limited by technical factors" issue, first, for it is dispositive.

**1**

**Commerce's Determination That Agro Dutch Did Not Show
That Technical Factors Limited Production in The Initial Phase of
Commercial Production Is Supported by Substantial Evidence
in The Record And Otherwise in Accordance With Law**

As noted above, the second prong of 19 U.S.C. § 1677b(f)(1)(C)(ii) (1994) requires that the importer show that "production levels are limited by technical factors associated with the initial phase of commercial production."  19 U.S.C. § 1677b(f)(1)(C)(ii)(II) (1994).

Commerce and Agro Dutch are in agreement that technical problems had to be solved in the new growing rooms.  Agro Dutch pointed to the installation and calibration of climate control equipment as the technical factors that had to be adjusted for the production in the new rooms to reach the production in the preexisting rooms.  Plaintiff's Memorandum at 15; Supplemental Section D Response at p. 3.  Commerce did not dispute this issue.  Final Determination at 72253.  Instead, it disputed whether the production levels were sufficiently limited by the installation and calibration of the equipment to meet the statute's requirement.  Id.

7

Specifically, Commerce determined that "the technical factors cited by Agro Dutch did not appear to limit production levels," and that "Agro Dutch has provided insufficient evidence to support [that] claim." Final Determination at 72253.

Commerce applied the "production levels are limited" clause in accordance with the Statement of Administrative Action.[3] It says that units processed are to be the measure of production levels, and that "attainment of peak production levels will not be the standard for identifying the end of the startup period, because the startup period may end well before a company achieves optimum capacity utilization." SAA at 166, 1994 U.S.C.C.A.N. at 3864.[4]

At oral argument, the Government clarified the term "units processed." Counsel explained that Commerce meant information on how many units Agro Dutch set out to produce. In other words, how

---

[3]Statement of Administrative Action of the Uruguay Round Agreements Act, accompanying HR 103-5110, reprinted in 1994 U.S.C.C.A.N. 3773 ("SAA").

Congress expressly approved the SAA:

> Statement of administrative action. The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.

19 U.S.C. § 3512(d)(1994). See Delverde, SrL v. United States, 989 F. Supp. 218, 230, n.18 (CIT 1997), vacated on other grounds, 202 F.3d 1360 (Fed. Cir. 2000).

[4]While this statement is in the context of defining the period of the startup, it is just as relevant to whether there is a startup in the first place.

much input was used during the period of investigation (POI). Agro Dutch provided evidence of total output in kilograms and yield rates expressed in percentages (both types of evidence referred to as "yields" or "output yields" by Agro Dutch). It provided no evidence of its units processed.

In evaluating the evidence that was provided, Commerce first found that Agro Dutch did not give data on its units processed. It then found that Agro Dutch had failed to even establish a benchmark against which Commerce could evaluate the evidence it did receive. Final Determination at 72254. Commerce concluded that the evidence provided was not useful, and that without either evidence of units processed or evidence sufficient to set a benchmark against which to compare the total output and yield rates provided, Agro Dutch could not support its claim of limited production levels. Final Determination at 72253-4.

Agro Dutch contends that instead of units processed, Commerce should have applied a test based on the mushroom output yields submitted into evidence. It argues that a yield-based test is perfectly reasonable for determining limited production levels, and that its output and yield rates in the new rooms during the claimed startup period were significantly lower than in the preexisting rooms. Plaintiff's Memorandum at 15-16. Agro Dutch defends its test by stating that "[a] more efficient production process . . . will inevitably lead to a higher production quantity based on cultivation of the same area," and that absent another explanation, Commerce should find that low output and low yield rates are due to startup operations. Id.

9

**a**
**Commerce Applied The Statute According to Congress's**
**Unambiguously Expressed Intent**

The court reviews Commerce's application of the statute according to the two-part test

established in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-

43 (1984).[5] The court first asks "whether Congress has directly spoken to the precise question at

issue." Id. at 842. If it has, and if its intent is clear, the court and Commerce must give effect to that

unambiguously expressed intent. Id. at 842-43. If it has not, Commerce has the discretion to interpret

the statute, and its interpretation will be upheld so long as it is reasonable. Id. at 843.

The statute itself does not define "production levels." The court must thus use standard tools of

statutory construction, including legislative history, to determine whether Congress's intent is judicially

ascertainable. Timex V.I., Inc. v. United States, 157 F.3d 879, 881-82 (Fed. Cir. 1998). Congress

unambiguously expressed its intent in the SAA where it stated that "[p]roduction levels will be

measured based on units processed."[6] SAA at 166, 1994 U.S.C.C.A.N. at 3864. The agency must

give effect to this clear statement. Chevron, 467 U.S. at 843. Here, Commerce did give effect to the

language when it stated that the SAA as "direct[ed] the Department [of Commerce] to examine the

---

[5]The court notes that the Supreme Court's recent decision in Christensen v. Harris County, 120 S.Ct. 1655, 2000 U.S. LEXIS 3003 (May 1, 2000), did not affect the court's application of Chevron in this case. Here the court does not reach the issue of deference dealt with in Christensen.

[6]While this statement is not made in direct reference to the issue of limited production levels, the court finds it persuasive.

number of units processed as a primary indicator of production levels in determining the end of the start-up period." Final Determination at 72254.

Agro Dutch contends that total output and yield rates provide better measures of production levels than a test based on units processed because "[a] more efficient production process (i.e. a higher yield) will inevitably lead to a higher production quantity based on cultivation of the same area." Plaintiff's Memorandum at 15-16. Agro Dutch claims this test is consistent with Congressional intent, and cites to the Congress's statement in the SAA which follows the previously quoted "units processed" clause, which states, "To the extent necessary, Commerce will also examine other factors, including historical data[.]" SAA at 166, 1994 U.S.C.C.A.N. at 3864. Agro Dutch argues that total output and yield rates fall under "other factors," and that Commerce therefore should consider them. Plaintiff's Memorandum at 16.

However, such an application of Congress's language would be contradictory to another clause of the SAA where Congress said, "[C]onsistent with the basic definition of a startup situation, Commerce will not extend the startup period so as to cover improvements and cost reductions that may occur over the entire life cycle of a product." SAA at 166, 1994 U.S.C.C.A.N. at 3864. If Congress did not intend to include improvements in efficiency in the startup period, and the way such improvements would be shown would be in increased output and higher yield rates (as Agro Dutch specifically argues in its Plaintiff's Memorandum at 15-16), then Congress did not endorse such

11

evidence as support for "limited" production levels for startup cost adjustments. Therefore, given Congress's stated intent, Agro Dutch's argument cannot prevail.

For the above reasons, the court finds that Commerce's application of 19 U.S.C. § 1677b(f)(1)(C)(ii) (1994) is in accord with Congressional intent.

**b**
**Commerce's Conclusion That Agro Dutch Did Not Meet**
**the "Limited Production Levels" Test Is**
**Supported by Substantial Record Evidence**

Under the units processed test, Commerce's conclusion that Agro Dutch did not show its production levels were limited is supported by substantial record evidence.

When asked to "Describe and quantify how you determined your company's commercial production level," Supplemental Questionnaire – Section D ("Supplemental Section D Questionnaire") (May 20, 1998) at 3, Agro Dutch submitted only total output information, Final Determination at 72254; Supplemental Section D Response, at Ex. D-Supp.-2. Agro Dutch did not submit to Commerce any evidence of its units processed,[7] or any evidence of a benchmark against which to evaluate those total output figures. Final Determination at 72254.

---

[7]Agro Dutch has made no claim that it did submit evidence of units processed.

Under the units processed test, evidence of Agro Dutch's output was not useful. Without evidence of the units processed, Commerce was unable to evaluate Agro Dutch's production levels. Final Determination at 72254. This lack of information on the record precluded Commerce from applying the statute as Congress intended.

Commerce then evaluated the evidence it did have before it and found that the evidence Agro Dutch did submit was not useful because Agro Dutch had not established a benchmark to show that its production levels were limited. Commerce was provided with production figures for the entire facility for 1996 and 1997, but Commerce could not know if these figures reflected "limited production levels" without other evidence to which it could compare the data.

Therefore, Commerce's finding that Agro Dutch did not show its production levels were limited is supported by substantial record evidence.

**i.**
**Increased Output Later in the Year**
**Failed To Establish a Benchmark**
**from Which Commerce Could See If Production Was "Limited"**

Agro Dutch argues that the output during the claimed startup period was far less than output achieved in the second half of the year, and that it did not achieve "normal production levels" until after the claimed startup period ended. Plaintiff's Memorandum at 14. Agro Dutch provided evidence of

the total output for the entire plant for each month of the years 1996 and 1997. Section B, C and D

Responses, Ex. D-1; Supplemental Section D Response, Ex. D-Supp.-2.


Commerce found that this was insufficient information to support a finding of limited production

levels.[8] <u>Final Determination</u> at 72254. Commerce needed a benchmark against which to compare this

data in order for it to be useful at all. It asked for a benchmark when it requested that Agro Dutch

"Describe and quantify how you determined your company's commercial production level."

Supplemental Section D Questionnaire, at 1. Instead of providing an explanation of what the

"commercial production level" was, Agro Dutch submitted a chart of total production output.

Supplemental Section D Response at 3 and Ex. D-Supp.-2.[9]

_____

[8]Agro Dutch argues that Commerce's explanation that it did not have evidence of production
levels limited by technical factors is simply not true, because Agro Dutch "fully described the technical
problems with air-conditioning and ventilation systems, which resulted in below average yields during
the start-up period[.]" Plaintiff's Memorandum at 15. This argument misses the point that both
technical factors <u>and</u> limited production levels must be shown. Commerce does not dispute that
evidence of the technical factors was submitted on the record. It found the record lacking in evidence
of limited production levels. <u>Final Determination</u> at 72254.

[9]On its face, the excerpted question is clear. Furthermore, the structure of the question
highlights that total production figures were not being requested by this particular part of the question.
The question reads:

3.    Provide monthly 1996 and 1997 figures for the quantity of mushrooms produced,
quantity of mushrooms purchased, the dry weight quantity of mushrooms entering the canning
process, the quantity of fresh mushrooms produced, and the total quantity sold as scrap.

In addition, provide the following information:
a.    Describe and quantify each technical factor that prevented the harvesting or
canning of mushrooms during the start-up period.
b.    Describe and quantify how you determined your company's commercial
production level.

The evidence only gave Commerce the opportunity to compare total plant output with the new rooms to production prior to their being built. This information did not suffice as a benchmark because the efficient production of the preexisting rooms is not necessarily a "normal" level, and so the comparison was not useful. As Commerce stated in its Final Determination, "under a comparative yield approach, a respondent may never leave the start-up phase because it may never reach comparative yields." Final Determination at 72254.

While Commerce did not request a specific item of information, Commerce noted that Agro Dutch did not provide "information, for example, on historical production or capacity usage at its

_____

c. Explain how you determined tell [sic] that other factors did not contribute to the lower production factors.

Supplemental Section D Questionnaire at 1. It should have been clear that subparts (a), (b) and (c) were requesting information other than that requested in the beginning of the question, because it asked for responses to the subparts "in addition" to the earlier requested information.

facilities to serve as a benchmark for measuring commercial production levels during the POI."[10]  Final Determination at 72254.

Since the evidence of increased production output submitted by Agro Dutch does not provide Commerce with any benchmark to use in its analysis, nor does it provide any information regarding units processed to allow Commerce to apply the statute, it does not demonstrate to the court that Commerce erred in its finding that this evidence did not show limited production levels in the new growing rooms.

---

[10]Agro Dutch argues that Commerce did not specifically request historical production information, that Agro Dutch would have provided it had Commerce so requested, and that Agro Dutch should not be penalized for not providing it nor "expected to anticipate every item of information that [Commerce] might find relevant."  Plaintiff's Reply Brief at 5.

In the court's view, Agro Dutch misunderstood Commerce.  Commerce needed a benchmark. Commerce does not say that it asked for but did not receive historical information, nor does it say that historical information was absolutely required.  It says that it provided no information to serve as a benchmark, and that information such as historical production and capacity usage may have served that purpose.

Furthermore, Commerce was not required to seek out the specific information it may have been able to use to establish such a guideline, especially since several types of information would have sufficed.  The burden of creating an adequate record lies with Agro Dutch, not with Commerce. Tianjin Machinery Import & Export Corp. v. United States, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992).  It is Commerce's burden to verify the  information it uses in its determination, id., but it is not required to seek out specific pieces of data to help the respondent.  In this case, Commerce requested information to set the benchmark when it asked Agro Dutch how it determined its "commercial production level," and Agro Dutch did not provide enough information.  It was not Commerce's obligation to then request specific pieces of information that may or may not have aided Agro Dutch's claim. Nation Ford Chem. Co. v. United States, 21 CIT 1371, 1374, 985 F. Supp. 133, 136 (1997) ("[Commerce] had no duty to seek out additional information not submitted by the parties").

**ii**
**Commerce Did Not Misinterpret Agro Dutch's Argument**
**That it Did Not Achieve "Normal" Production Levels**

Agro Dutch further claims that the rejection of the limited production levels argument was in error because Commerce allegedly misinterpreted Agro Dutch's argument as meaning it had failed to reach peak production levels, as opposed to "normal" production levels. Plaintiff's Memorandum at 14. Commerce found that "[a]lthough production levels at the growing houses in question were not at their peak levels, Agro Dutch was able to produce sizable quantities of mushrooms." Final Determination at 72253.

Agro Dutch argues that it did not simply claim it failed to reach peak production, but that it fell well short of peak levels even after the claimed startup period ended and did not achieve "normal" production levels until three months after the end of the claimed startup period. Plaintiff's Memorandum at 14.

It does not appear to the court that Commerce misunderstood Agro Dutch's argument. Commerce found that it did not have enough evidence to determine whether production levels were limited. Final Determination at 72254. It agreed that the levels were below peak, but it was unable to determine if the "sizable quantities" of mushrooms produced were limited or normal production quantities. Id. at 72253. Although Agro Dutch's yields were below peak, it does not necessarily

17

follow that the production levels were limited.  See SAA at 166, 1994 U.S.C.C.A.N. at 3864.

Without a valid benchmark, Commerce could not evaluate the yields properly.

Therefore, the court finds no misunderstanding on Commerce's part, and no reason to disturb

its finding that it lacked sufficient evidence of limited production levels.

**iii**
**Agro Dutch Misunderstood Commerce's Statement That**
**Production Levels at the Preexisting Facility Were**
**Not Claimed to Be Limited**

Finally, Agro Dutch claims that Commerce erred when it stated that "Agro Dutch made no

claim that commercial production levels at the preexisting operations were limited by any technical

factors associated with the new capacity."  Final Determination at 72253; Plaintiff's Memorandum at

13.  This statement was made in the context of Commerce rejecting Agro Dutch's claim of limited

production levels.  Final Determination at 72253.  Agro Dutch argues that "[Commerce] cites to no

statutory or logical reason that an old facility must be limited for technical reasons for a new facility to

qualify for a start-up claim."  Plaintiff's Memorandum at 13 (emphasis in original).

Agro Dutch misunderstood Commerce.  Commerce found that it did not have evidence that

production levels in the new growing rooms were limited.  Final Determination at 72253-4.  This

statement about the preexisting rooms was merely an additional note that no claim was made that the

rest of the production site had limited production levels.  Id. at 72253.  It is clear from a reading of the

<u>Final Determination</u> that Commerce's point was simply that it did not have an alternative argument before it that production levels in the plant as a whole were limited.

Therefore the court holds that as to the second prong of the startup cost adjustment test, Commerce's determination is supported by substantial evidence in the record and otherwise in accordance with law.[11]

---

[11]The court notes Plaintiff's concern that upholding Commerce's determination will lead to the "absurd result" that "if the number of units processed is low because of a lack of orders, a company will get the start-up adjustment . . . [but] if the company has more orders and processes more goods, even at a yield rate that, due to technical factors associated with the start-up phase of production, is a small fraction of the normal rate, it is denied the start-up adjustment." Plaintiff's Memorandum at 16.

However, the statute specifically says that "[i]n determining whether commercial production levels have been achieved, [Commerce] shall consider factors unrelated to startup operations that might affect the volume of production processed, such as demand, seasonality, or business cycles." 19 U.S.C. § 1677b(f)(1)(C)(ii) (1994). Therefore, if the number of units processed is low due to a lack of orders, it will not be an indicator of startup production.

Furthermore, the statute requires more than simply a low number of units processed. It also requires a new product or new facility, and technical factors limiting production. So, even if a company satisfied the low number of units processed aspect of the statute, it would need to show more in order to qualify for the startup cost adjustment.

Plaintiff's concerns are therefore unfounded.

19

**Whether Commerce's Determination That the Additional Growing Rooms
Did Not Constitute a "New Facility" Is Supported by Substantial Evidence
Need Not Be Reached Due to the Conclusion Above, but Commerce's
Lack of Reasoning and Mathematical Error Cast Doubt on Its Conclusions**

Remand on the startup cost adjustment is denied due to the court's conclusion above.

However, the court finds it appropriate to briefly address the "new facility" prong of 19 U.S.C.

§ 1677b(f)(1)(C)(ii) (1994) for reasons of judicial economy.[12]

The first prong of the statute states that startup cost adjustments are only to be made if "a

producer is using new facilities or producing a new product that requires substantial additional

investment." 19 U.S.C. § 1677b(f)(1)(C)(ii)(I) (1994). Agro Dutch argues that the new growing

rooms constitute a "new facility." Plaintiff's Memorandum at 12.

Agro Dutch had a total of forty-four growing rooms in 1996 when it began constructing an

additional twenty-two. Section B, C and D Responses, at Sec. D, p. 64. Commerce found that the

expansion "by one third" did not "rise[] to the level of expansion contemplated by the language in the

---

[12]This issue is rarely heard before the Court of International Trade, and here it has been raised, fully briefed and argued. In prior antidumping investigations, Commerce's reasoning on the issue of what constitutes a "new facility" has been scant. Only one of those cases has resulted in a published opinion of this court. See Pohang Iron and Steel Co, Ltd. v. United States, 1999 WL 970743 (CIT). In light of Commerce's lack of reasoning in this case and in others, the court finds it appropriate to make use of the current posture, having the issue fully briefed and argued before it, to analyze the issue here.

SAA." Final Determination at 72253. Agro Dutch contests this finding by alleging, inter alia, a) that Commerce made a mathematical error because the expansion was an addition of one-half, not one-third, of the capacity of the plant; b) that an increase in capacity by one-half is a "major undertaking," the term used in the SAA; and c) that a new building with a new air conditioning system constitutes a "new facility." Plaintiff's Memorandum at 2.

Commerce's interpretation of this provision of the statute is entitled to Chevron deference. The first question is "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842.

"New facility" is not defined in the statute. Commerce is given guidance by the legislative history where in defining "startup" in the SAA, Congress states:

> Mere improvements to existing products or ongoing improvements to existing facilities will not qualify for a startup adjustment. Commerce also will not consider an expansion of the capacity of an existing production line to be a startup operation unless the expansion constitutes such a major undertaking that it requires the construction of a new facility and results in a depression of production levels due to technical factors associated with the initial phase of commercial production of the expanded facilities.

> "New production facilities" includes the substantially complete retooling of an existing plant. Substantially complete retooling involves the replacement of nearly all production machinery or the equivalent rebuilding of existing machinery.

SAA at 166, 1994 U.S.C.C.A.N. at 3864 (emphasis added).

21

Commerce did not analyze this guiding language at all in its analysis, nor did it provide any

details of its reasoning.[13]  The only explanation that Commerce gave was its statement that

_____

[13]This issue is one undeveloped by administrative practice or case law.  Although Congress left the details up to Commerce, Commerce has not specifically defined in its regulations, its <u>Final Determination</u> in this case, or its rulings in any other cases, what is necessary to meet the requirements for a startup.  Commerce has never articulated the standards it applies.

A representative example of a startup cost adjustment that has been granted in the past is <u>Notice of Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke the Antidumping Duty Order: Brass Sheet and Strip from the Netherlands</u> ("<u>Dutch Brass</u>"), 65 Fed. Reg. 742 (Dep't Commerce 2000).  There, the startup cost adjustment was granted for the wholesale replacement of an old ring casting mill.  However, Commerce's reasoning is virtually non-existent.  The new strip casting mill was considered by Commerce to be a "new facility" because it was a "wholesale replacement" of the old mill, but no elaboration was given.  <u>Id</u>. at 744.

Other rulings by Commerce on this issue are denials of the startup cost adjustment.  Some admit that the construction for which a startup cost adjustment is claimed is a "new facility," and deny the adjustment on other grounds, <u>Notice of Final Determination of Sales at Less Than Fair Value: Foam Extruded PVC and Polystyrene Framing Stock From the United Kingdom</u>, 61 Fed. Reg. 51411, 51420 (Dep't Commerce 1996) (assuming that there was a new facility without ever discussing the issue); <u>Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada: Preliminary Results of Antidumping Duty Administrative Reviews and Intent To Revoke in-Part</u>, 63 Fed. Reg. 37320, 37325 (Dep't Commerce 1998) (stating only that Commerce agreed that there was a "new facility"); <u>Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Static Random Access Memory Semiconductors From Taiwan</u>, 62 Fed. Reg. 51442, 51448 (Dep't Commerce 1997) (stating that a new facility existed without giving any explanation as to why the claimed construction qualified as a "new facility"), and others deny the existence of "new facilities," some with little or no explanation, <u>Notice of Final Determination of Sales at Not Less Than Fair Value: Collated Roofing Nails From Korea</u>, 62 Fed. Reg. 51420, 51426 (Dep't Commerce 1997) (relocation of facility without replacement of equipment is not enough); <u>Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea: Final Results of Antidumping Duty Administrative Reviews</u>, 64 Fed. Reg. 12927, 12950 (Dep't Commerce 1999) (one new production line in a large production plant does not constitute a substantial modification to meet the statute); <u>Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea:  Final Results of Antidumping Duty Administrative Reviews</u>, 63 Fed. Reg. 13170, 13200 (Dep't Commerce 1998) ("<u>Korean Steel</u>") (no convincing evidence given for why one production line is a "new facility" by itself).

"we do not think that the expansion of capacity by one third rises to the level of expansion contemplated by the language in the SAA." Final Determination at 72253.

This explanation might have been sufficient had Commerce been correct in its factual statement regarding the expansion. However, the "one-third" expansion was actually, based on the numbers of rooms, a 50% increase in capacity.[14] Since Commerce was mistaken as to that underlying fact, its conclusion that it is not enough is inherently questionable. This is particularly so in light of the lack of

---

This court dealt in depth with the "new facility" issue in Pohang (an appeal from Commerce's ruling in Korean Steel, noted above). In that case, the steel producer alleged that installation of a new production line in its existing plant qualified for a startup cost adjustment. Commerce denied the adjustment, and the court affirmed.

Commerce again provided very little reasoning for its conclusion, however. It stated that the new lines produced merchandise similar to that produced on the older lines, and that the manufacturer did not provide any "convincing evidence that the new line should be considered 'new production facilities' or 'the substantially complete retooling of an existing plant.'" Korean Steel, 63 Fed. Reg. at 13200.

In its review, the court pointed out these same reasons for the denial, and further stated that the expending of "considerable costs" alone did not make the new construction a new facility. Pohang at *5.

[14]Prior to building the new growing rooms here at issue, Agro Dutch had forty-four growing rooms. Fifty percent of forty-four is twenty-two. When they finished the new growing rooms, they had added twenty-two, or fifty percent, for a total of sixty-six. In its Final Determination, Commerce refers to the expansion as being by one-third. Obviously, when the construction was complete, the new growing rooms comprised one-third of the total number of growing rooms, but the total expansion was fifty percent.

That analysis assumes that the growing rooms were of equal size. At oral argument, the parties were unable to point to any evidence of record regarding the size of the growing rooms, either preexisting or newly constructed. Accordingly, there is no way for this court to determine the actual size ratio between existing and new space.

detailed reasoning. Because Commerce also failed to explain its interpretation of the term "new facility," the court could not even determine if the construction of the statute was reasonable.[15]

However, the court does not need to decide whether Commerce's interpretation is reasonable or if its conclusion is supported by substantial record evidence, because Commerce's finding that Agro Dutch had not satisfied the "production levels limited by technical factors" prong was based on a permissible construction of the statute and was supported by substantial evidence on the record. There is therefore no need for a holding on this issue.[16]

---

[15]At oral argument, both parties addressed the "new facility" issue. The Government advanced the argument that the subject merchandise is preserved mushrooms, and that the growing rooms produce fresh mushrooms as only a part of the preserved mushroom production process. Therefore, the Government argued, the fresh mushroom production area could not be considered a "facility" for purposes of a preserved mushroom review. The court finds this argument persuasive, but notes that this post hoc rationalization would not suffice if the court needed to determine if Commerce's construction of the statute was reasonable.

[16]The court does note, however, that Agro Dutch's argument that "[a] new building, with a new type of air-conditioning equipment, that adds 50 percent to the capacity of a company, is a new facility," Plaintiff's Memorandum at 13, is as jejune as Commerce's denial of the "new facility." In arguing that Commerce's denial was based on faulty math, Agro Dutch says, "DOC provides no explanation whatsoever as to why an increase of 50 percent (or even of one-third) is so small that it must result in a rejection of a start-up adjustment." Plaintiff's Memorandum at 14. While this is true, it would be no more satisfactory for Commerce to state that a 50% increase is enough without further elaboration (as illustrated by the cases cited above).

24

**B**

**Commerce's Partial Rejection of Agro Dutch's Cost Allocation Methodology
and Determination That Materials and Other Non-Picking Costs
Should Not Be Allocated More Heavily to Small Mushrooms than
Large Mushrooms Is Supported by Substantial Record Evidence
and Otherwise in Accordance with Law**

In the course of any antidumping investigation, normal value must be determined. 19 U.S.C. § 1677b(a) (1994). Normal value is roughly the price at which the subject goods are sold in the exporting company's home market. Id. If Commerce has "reasonable grounds to believe or suspect" that the foreign product has been sold in the home country at less than the cost of production ("COP"), then Commerce must calculate the COP to determine if such sales have indeed occurred. 19 U.S.C. § 1677b(b)(1) and (b)(3) (1994). The importance of the COP calculation is that if Commerce finds that the exporter sold goods in the home market for less than the COP, and if such sales were made over an extended period of time or in substantial quantities, those sales may be excluded from the calculation of normal value. 19 U.S.C. § 1677b(b)(1)(B) and (b)(2)(c)(i) (1994).[17]

---

[17]The consequence of such exclusion is that the normal value is higher than it would otherwise be, which means that U.S. sales are more likely to be at less than fair value. This increases the likelihood of a dumping margin being imposed, and increases the size of that margin. If, however, the COP is decreased due to the way costs are allocated, fewer sales in the home market may be at less than COP. Consequently, fewer sales may be excluded (if any), leading to a lower normal value because more low-end (but above COP) sales would be included in the calculation of normal value. See Raj Bhala, International Trade Law: Cases and Materials 654 (1996) ("It is an arithmetic fact that the exclusion raises the average and, therefore, increases the likelihood of finding, and size of, a dumping margin.")

Whenever possible, in calculating the COP, allocation of costs should follow the methodology employed by the producer in its books. 19 U.S.C. § 1677b(f)(1)(A) (1994).[18] Agro Dutch, however, did not have a cost accounting system. Section B, C and D Responses, at 64; Final Determination at 72254; Plaintiff's Memorandum at 18. Therefore, it was necessary for Agro Dutch to establish a cost allocation methodology for purposes of this investigation. Final Determination at 72254. The system Agro Dutch established allocated both picking and non-picking costs depending on the size of the mushrooms produced, with small mushrooms being allocated a higher proportion of all costs than the larger mushrooms. Id.

Commerce accepted Agro Dutch's argument that small mushrooms were more expensive in terms of harvesting labor cost. Id. Commerce did not, however, accept that non-picking, meaning materials, non-picking labor and overhead, costs were higher for small mushrooms than for large. Id. Commerce found that for non-picking costs, "the cost per kilogram of growing a large or small

_____

[18] The statute reads, in pertinent part:
(f) Special rules for calculation of cost of production and for calculation of constructed value

For purposes of subsections (b) and (e) of this section. –

  (1) Costs

   (A) In general

      Costs shall normally be calculated based on the records of the exporter or producer of
      the merchandise, if such records are kept in accordance with the generally accepted
      accounting principles of the exporting country (or the producing country, where
      appropriate) and reasonably reflect the costs associated with the production and sale of
      the merchandise.

26

mushroom is identical." Id. Accordingly, Commerce allocated non-picking costs evenly by kilogram of mushrooms, regardless of size. Id. Commerce gave several reasons for its conclusion. The facts underlying its reasons came directly from Agro Dutch's questionnaire responses, and Agro Dutch does not dispute any of Commerce's articulated reasons.

First, Commerce said, "there is very little growing time difference" between a large mushroom and a small one. Id. Second, it found that "different size mushrooms grow side-by-side, incurring the identical costs (i.e., materials, non-picking labor, and overhead)." Id. Third, Commerce stated that weight is the measure used in the business of mushrooms. Id. Agro Dutch tracks its mushrooms by weight and not by "number of mushrooms, estimated yields, or by relative sales value," and sells them by weight. Id. In other words, Agro Dutch does not normally track its mushrooms by size and weight, but simply by overall weight.

Agro Dutch makes a factual argument that in the calculation of its COP, Commerce should have allocated all of Agro Dutch's production costs more heavily on the smaller mushrooms produced than on the larger mushrooms. Plaintiff's Memorandum at 8. To support this argument, Agro Dutch points to a demonstration given at verification that was intended to show that more material went into each kilogram of small mushrooms than into each kilogram of large. Id. at 9. In the demonstration, all of the small mushrooms from three growing bags, then all of the large mushrooms from another set of three growing bags, were picked. Six times as many kilograms of large mushrooms as small mushrooms were produced by three bags. Id. at 10.

27

However, this demonstration is far from conclusive evidence. Facially, it appears to support Agro Dutch's position. However, other record evidence casts doubt on its validity. For example, in Agro Dutch's Supplemental Section D Response at 8, it illustrates that mushrooms do not grow at the same rate, so bags normally used in production do not produce uniform small or large mushrooms, as the bags used at the demonstration did. Agro Dutch's response reads: "These [button] mushrooms have been smothered by surrounding mushrooms in the compost bag that have grown to their maximum size. These mushrooms are picked with other mushrooms that have reached peak size." Id. In other words, the large and small mushrooms are produced at the same time of the same bags.

In another response, Agro Dutch further casts doubt on its demonstration. It says, "In actuality, each size and grade of mushroom can be and often is picked from the same bag on the same day." Section B, C, and D Responses at 66.

The standard of review requires "substantial evidence on the record," 19 U.S.C. § 1516a(b)(1)(B)(i) (1994); it does not require that all evidence be in favor of Commerce's decision, Cinsa, S.A. de C.V. v. United States, 21 CIT 341, 343, 966 F. Supp. 1230, 1233 (1997) (stating "substantial evidence is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" (citations and punctuation omitted)), and it appears to the court that Agro Dutch's demonstration is far from conclusive evidence in Agro Dutch's favor. It is

28

certainly insufficient to overcome the substantial record evidence identified by Commerce and uncontested by Agro Dutch.

Furthermore, Agro Dutch has not shown that the conclusion Commerce reached was unreasonable, which is the threshold showing required. Chevron at 843. At most, Agro Dutch has identified record evidence which might point to a different allocation of costs. Such a showing is insufficient, however, to undermine Commerce's findings. Cinsa, S.A., 21 CIT at 343, 966 F. Supp. at 1233. Commerce has not committed error by not addressing this demonstration in the Final Determination. Remand of this matter for further consideration is unnecessary.[19]

---

[19]The court will not reweigh the evidence placed before Commerce, Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988) ("It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence. . . .") or substitute its own judgment for the agency's if the conclusion reached by the agency is reasonable and supported by substantial evidence in the record. Ceramica Regiomontana, S.A., 10 CIT at 404-5, 636 F. Supp. at 966 ("As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.")

The court finds that the reasons set forth by Commerce in the Final Determination are supported by substantial record evidence. Therefore, the court will not disturb Commerce's finding, and affirms Commerce's cost allocation determination.

V

CONCLUSION

For the foregoing reasons, the court finds that Commerce correctly denied the startup cost adjustment, as its conclusion that Agro Dutch did not meet the second prong of the two-part test was supported by substantial record evidence, and that Commerce's conclusion that costs should not be allocated more heavily on the small than the large mushrooms was also supported by substantial record evidence.

The court therefore affirms Commerce's Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms From India, 63 Fed. Reg. 72246 (Dep't Commerce 1998) in its entirety.

_____
Evan J. Wallach, Judge

Date: June 19, 2000
New York, New York